**CHAMPIONSHIP WRESTLING, INC.,**
**Appellant (Plaintiff),**

**v.**

**STATE BOXING COMMISSION of the**
**State of Indiana and Treasurer of**
**Indiana, Appellees (Defendants).**

**No. 2–184A3.**

Court of Appeals of Indiana,
Second District.

April 23, 1985.

Rehearing Denied June 11, 1985.

Douglass R. Shortridge, Professional Corporation, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Frederick S. Bremer, Deputy Atty. Gen., Indianapolis, for appellees.

BUCHANAN, Chief Judge.

### CASE SUMMARY

The contestants in this appeal, plaintiff-appellant, Championship Wrestling, Inc. (Championship), and the defendant-appellees, State Boxing Commission (Boxing Commission) and the Treasurer of Indiana [hereinafter collectively referred to as the State], seek a rematch of the trial court action in which Championship unsuccessfully sought an injunction and a declaratory judgment that the 10% tax imposed on the gross receipts from the sale of tickets to wrestling events is invalid, because it violates Championship's right to equal protection of the law.

We reverse.

### FACTS

In the early part of the 20th century, it is safe to assume that professional wrestling was illegal in Indiana. *See* 1905 Ind.Acts, c. 169, §§ 435–37, 684–85. Section 435 prohibited fighting in a duel. Section 436 prohibited participating in a prizefight in any capacity. Section 437 prohibited participation in an "affray," that is, fighting in any public place by agreement. However, both professional boxing and wrestling were legalized in 1931 by the Indiana General Assembly's passage of the "Athletic Commission Act". 1931 Ind.Acts c. 93, 273, (codi-fied as amended in pre-1981 amendment form at Ind.Code Ann. 25–9–1–1 to –33 (West 1980) and in post-1981 amendment form at IC 25–9–1–1 to –33 (1982)). This Act stated that professional matches "may be held in Indiana except on Sunday" and expressly attempted to repeal all criminal statutes which had previously prohibited such events. In place of the criminal statutes, the Act created and imposed a comprehensive regulatory scheme over all aspects of the professions, which dictated the manner in which matches could be conducted and included penalties for the failure to comply with the Act's protective provisions. The State Athletic Commission was created and was delegated the responsibility to administer the regulatory scheme to insure that these gentle "sports," when practiced professionally, were conducted in compliance with the Act. Among other things, the Athletic Commission was vested with broad authority to review qualifications for licenses and permits, issue the required licenses and permits, and conduct inspections. In addition to the extensive regulatory requirements, the Act also imposed a 10% tax on the gross receipts received from the sale of tickets to boxing and wrestling events. While all forms of amateur boxing and wrestling were specifically permitted by the Act, they were also expressly exempted from all of the Act's regulatory and tax provisions.

Over the ensuing years, the original Act has been amended several times. However, only two of these amendments have any particular significance to the issue raised by this case. The first of these was passed in 1979 when it was discovered that Marvin Johnson, a popular Indianapolis boxer, had scheduled his nationally televised championship fight for a Sunday, in violation of the Act's prohibition against Sunday matches. The fight proceeded as scheduled, however, when the legislature skillfully decked the Sunday prohibition by enacting the "Marvin Johnson Act," which amended the Act to immediately eliminate the Sunday prohibition by declaring an

emergency. 1979 Ind.Acts Pub.L. No. 243–1979. *Record* at 178.

In 1981, the legislature enacted a second and more comprehensive amendment of the Athletic Commission Act. 1981 Ind.Acts Pub.L. No. 222–1981, §§ 75–102, 1799–1812. This amendment dramatically altered the Act's relationship and application to the occupations of professional wrestling. Among other significant changes, the amendment renamed the Athletic Commission the State Boxing Commission, abolished all licensing or permit requirements previously imposed on any person engaged in any aspect of professional wrestling, and entirely eliminated all authority of the newly named Boxing Commission to regulate or control any facet of professional wrestling. The regulatory scheme and the Boxing Commission's authority over professional boxing were retained, however. Thus, the Act is now more appropriately referred to as the Boxing Commission Act. *See* IC 25–9–1–1 to –33 (1982). The changes effected in the Act as it relates to wrestling are highlighted by a review of the amending Pub.L. No. 222, which reveals the legislature systematically deleted all references to professional wrestling from the regulatory provisions of the Act. In spite of the complete deregulation of wrestling, one significant reference to wrestling was retained in the Boxing Commission Act. That reference is found in IC 25–9–1–22 which continues to impose the 10% tax on the gross receipts received from the sale of tickets to wrestling events. With the exception of this tax and a similar tax imposed on closed circuit telecasts of professional boxing or wrestling events, the Act is now devoid of any mention of wrestling and deals exclusively with the regulation of professional boxing. It is this state of affairs which provoked Championship to claim that the tax on wrestling is unconstitutional because the classification continues to tax wrestling even though it bears no existing relationship to any apparent purpose of the Boxing Commission Act in its present form.

The trial court concluded "that there has been a State purpose and policy to prohibit public fighting except under controlled and regulated circumstances." *Record* at 117. It also concluded that the tax on wrestling is rationally related to the advancement of that purpose, even though boxing continues to be tightly controlled, licensed, and regulated while wrestling is not, "since the ten per cent tax has a tendency to discourage both boxing and wrestling." *Record* at 118. Based on these conclusions, the trial court upheld the constitutionality of the tax and raised the State's arm in victory.

Championship's appeal asserts that the trial court's conclusions and judgment are contrary to law and presents a single issue for our consideration.

### ISSUE

Whether the continued tax on wrestling violates Championship's right to equal protection under the state or federal constitutions?[1]

### DECISION

PARTIES' CONTENTIONS—Championship contends the imposition of the tax on wrestling must bear a fair and substantial relationship to some reasonably conceivable purpose of the Act which imposes the tax. Championship also argues that the legislature's amendment of the Act to deregulate wrestling clearly changed the basic character and purpose of the Act, which is now solely the regulation of boxing, and had the effect of destroying any relationship between this purpose and the continued tax on wrestling.

---

1. The equal protection provisions of our state and federal constitutions are contained in IND. CONST. art. I, § 23, and U.S. CONST. amend. XIV, § 1. The rights protected by either of these constitutions are identical. *Reilly v. Robertson* (1977), 266 Ind. 29, 360 N.E.2d 171. Moreover, the validity of the particular statute is tested by the same standard regardless of whether the claim is based on the state or federal provisions, or both. *See Indiana Aeronautics Comm'n v. Ambassadair, Inc.* (1977), 267 Ind. 137, 368 N.E.2d 1340.

The State, on the other hand, does not dispute Championship's characterization of the purpose of the Act and agrees that the tax must bear a fair and substantial relationship to some object of the legislation. But, the State finds a public policy and purpose in preventing and discouraging public forms of fighting and argues the tax is rationally related to that policy because it has a tendency to discourage wrestling events.

CONCLUSION—The Boxing Commission Act displays no legislative intent or purpose to discourage public fighting, but rather manifests as its sole purpose the regulation of professional boxing. Thus, the tax on wrestling bears no relationship to this purpose and is invalid under the equal protection provisions of both the state and federal constitutions.

 Before the bell sounds and we address the specific issue raised by the contestants, we should announce the basic rules of the ring in any contest testing the constitutional validity of a statute. Every act of the legislature comes to us with a strong presumption of constitutionality. *Taxpayers Lobby of Ind., Inc. v. Orr* (1974), 262 Ind. 92, 311 N.E.2d 814. The legislature has broad discretion in the classification of businesses or occupations for the purpose of levying taxes, and it is not our role to judge the wisdom or justness of the particular tax in question or to criticize the public policy which motivated it; these are legislative questions. *Lutz v. Arnold* (1935), 208 Ind. 480, 193 N.E. 840. The burden is on the challenger to clearly demonstrate the statute's invalidity, and all doubts are resolved in favor of the statute. *Taxpayers Lobby, supra.* Yet, we must recognize that the State's inherent power to tax is subject to the limitations imposed by the equal protection provisions of the state and federal constitutions. *Indiana Aeronautics Comm'n, supra.* The outer periphery of a state's power to levy taxes has been aptly described by the United States Supreme Court in *Allied Stores of Ohio, Inc. v. Bowers* (1959), 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480.

"[T]here is a point beyond which the State cannot go without violating the Equal Protection Clause. The State must proceed upon a rational basis and may not resort to a classification that is palpably arbitrary. The rule often has been stated to be that the classification 'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation.'"

*Id.* at 527, 79 S.Ct. at 441 (citations omitted) *quoted in Ambassadair, supra* at 143, 368 N.E.2d at 1344. In applying this test, we must make an independent analysis of the statute considering its "general character" and "overall objective" to determine "whether any reasonably conceivable purpose exists which would support the constitutionality of the classification employed." *Ambassadair, supra* at 144, 368 N.E.2d at 1344.

 In this case, the "general character" and "overall objective" of the Boxing Commission Act leave no doubt that its primary purpose is the regulation of professional boxing for the protection of boxers from the inherent dangers of their sport. *Cf. Ralston v. Ryan* (1940), 217 Ind. 482, 484, 29 N.E.2d 202, 203 (where it is stated: "The purpose of legislation requiring occupational or professional licenses is to subserve the public good and prevent such occupations or professions from being conducted in a manner injurious to the public welfare."). As the Boxing Commission Act no longer provides for any regulation of wrestling, and its regulatory purpose relates only to boxing, there can be no relationship between this purpose and the legislative classification which continues to tax wrestling.

We must, nevertheless, ascertain whether the Boxing Commission Act expresses "any reasonably conceivable purpose" that would support the validity of the challenged tax. *Ambassadair, supra* at 144, 368 N.E.2d at 1344. With this in mind, we consider the State's argument that there is evidence of a public policy against and a purpose to prevent public forms of fighting or combat. Such evidence, the State says,

exists in our disorderly conduct statute, IC 35–45–1–3 (1982), which provides:

"A person who recklessly, knowingly, or intentionally:

(1) engages in fighting or in tumultuous conduct;

(2) makes unreasonable noise and continues to do so after being asked to stop;

(3) disrupts a lawful assembly of persons; or

(4) obstructs vehicular or pedestrian traffic; commits disorderly conduct, a Class B misdemeanor."

"Tumultuous conduct" is defined in IC 35–45–1–1 (1982) as "conduct that results in, or is likely to result in, serious bodily injury to a person or substantial damage to property." Professional wrestling events, it is claimed, violate this statute and the state policy against public fighting. Professional wrestling events are permitted to do so, however, because "[p]resumably the portions of the criminal code found at IC 35–41–3–1 saying that a 'person is justified in engaging in conduct otherwise prohibited if he has legal authority to do so' allows for the forms of combat permitted, taxed and regulated under the State Boxing Commission Act." *Appellee's Brief* at 3. Thus, the State's argument ingeniously proceeds, payment of the tax is the *only* thing that provides professional wrestling with the "legal authority" to violate the statute, and, if we strike the tax as unconstitutional, the promoters and participants of wrestling events will be subject to criminal prosecution.

The State's argument is creative, but fails to provide a legal or logical rationale for the assumptions on which it is based. First, without providing any cogent argument or citation to supporting authority, the State assumes that the imposition and payment of the tax somehow bestows on professional wrestling the implied "legal authority" to engage in an activity allegedly prohibited by a criminal statute, a statute completely unrelated to the payment of any tax. In essence, the State's argument is that the "authorizing tax" is a sort of penalty in lieu of prosecution. Upon payment, the State is then willing to excuse or ignore the violation. We are unwilling to accept such a convoluted thesis. The proceeds of illegal activities such as gambling or the sale of illegal drugs may be taxed, but payment thereof does not create the "legal authority" to violate the criminal prohibitions. Likewise, if wrestling is illegal, it has been so for many years, with or without the tax, and payment of the tax could not authorize its violations of the disorderly conduct statute. However, professional wrestling is not illegal and has not been prohibited by criminal sanctions for more than fifty years. This is so not because it has been required to pay an "authorizing tax," but because it was expressly legalized by the original Act in 1931. Second, the legislature's decision in 1981 to liberate wrestling even further from State regulation and control did not have the implied effect of making wrestling a criminal activity again. There is no basis in reason or law for such a result.

We might also observe that other sports seemingly fit the definition of disorderly conduct more realistically than professional wrestling. Amateur boxing is the most obvious example. Hockey and football are also combat-like games. Both require conduct inherently "likely to result in, serious bodily injury ..." and, not infrequently, involve actual fighting. These sports are not prohibited by the statute, however, even though they pay no "authorizing tax". The only authority these sports have to justify their inherent violence is longstanding public acceptance and popularity. Thus, the conclusion is inevitable: the disorderly conduct statute does not express a public policy against or prohibit any athletic event, including professional wrestling, merely because it involves risk of injury or even fighting.

In apparent anticipation of this conclusion, the State maintains that the tax itself is evidence of public disapproval of professional wrestling; the tax is meant to discourage professional wrestling events.

The Boxing Commission Act, however, provides no evidence of disapproval of or a legislative purpose to discourage wrestling. To the contrary, the original Act repealed the statutes prohibiting professional boxing and wrestling and authorized such events subject to government regulation. Thus, far from attempting to discourage either boxing or wrestling, the Act allowed and even encouraged them by removing the absolute prohibition. While the challenged tax was first imposed on wrestling and boxing by the original Act, its purpose was to raise revenue primarily to defray the costs of the regulatory bureaucracy and not to discourage the activities.[2] Furthermore, the original Act did prohibit Sunday events, but even this meager evidence of some public disapproval of boxing and wrestling was eliminated by the 1979 "Marvin Johnson" amendment. Finally, the 1981 amendment completely deregulated wrestling. In doing so, the legislature removed significant impediments to the staging of a wrestling match (requirements which might have discouraged the promotion of such events) and, if anything, encouraged rather than discouraged wrestling. It is quite reasonable to conclude that the evolution of this Act demonstrates a growing acceptance and even approval of wrestling.

To the extent the tax is justified as a means of regulation (in that it somehow protects and promotes the public health, safety, and welfare by discouraging public fighting), reliance is placed on the exercise of the police power. Several considerations weigh very heavily against the view that the tax was intended to serve a regulatory, police power function. First and most importantly, the legislature, by removing wrestling from the regulatory requirements of the Act, unequivocally disclaimed any intention of regulating wrestling. Second, taxes are for the purpose of raising revenue under the taxing power, while the regulation of occupations for the protection of the public is accomplished by an exercise of the police power. If the primary purpose of the tax is to raise revenue, it is a tax and not an exercise of the police power to regulate. *Besozzi v. Indiana Emp. Sec. Bd.* (1957), 237 Ind. 341, 146 N.E.2d 100; *Department of Treasury v. Midwest Liquor Dealers* (1943), 113 Ind.App. 569, 48 N.E.2d 71. Because this tax was originally imposed in conjunction with an extensive set of regulations, it is unmistakeable that its primary purpose was to raise revenue to pay the cost of the regulatory scheme. Thus, it is a tax and not a means of regulation. Third, even if the tax had been intended to regulate, it would be void as an invalid exercise of the police power. An exercise of the police power must be designed to accomplish the goal of promoting the health, safety, or welfare of society. That is to say, "the methods or means used to protect the public health, morals, safety or welfare, must have some relation to the end in view...." *Kirtley v. State* (1949), 227 Ind. 175, 181, 84 N.E.2d 712, 715. While the tax may, arguably, tend to discourage wrestling, it has no relationship to the promotion of the public welfare because it can not prohibit or regulate wrestling in any meaningful way that would protect the public and is completely incapable of achieving that goal. As long as the tax is paid, wrestling matches may continue to increase in number and violence without any limit or control. Absent other protective regulation, a tax discourages the activity only in theory, does nothing to protect the public, and is an unauthorized exercise of the State's police power. *See id.* (a law that requires something to be done that does not promote the public welfare is an unauthorized exercise of police power).

Having found the Boxing Commission Act expresses no purpose to discourage professional wrestling and no relationship

---

**2.** *See* 1931 Ind.Acts, c. 93, §§ 3, 32, 36. This fact explains why the tax is still constitutional as applied to boxing, but not wrestling. Because the purpose of the Act is to regulate boxing, and the tax burden is assessed against the activity requiring the regulation, there is a rational relationship between the two which justifies the tax on boxing. This relationship does not exist in the case of wrestling, which is unregulated.

between the continued tax on wrestling and any other reasonably conceivable purpose of the Boxing Commission Act in its present form, the tax imposed on wrestling by IC 25–9–1–22 is arbitrary and does violence to Championship's right to equal protection.

Reversed.

SULLIVAN and SHIELDS, JJ., concur.